UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |  |
|---|---|---|
| JOHN POPE, Individually and On Behalf of All Other Similarly Situated Shareholders of CLIFFS NATURAL RESOURCES INC., | ) ) ) ) | CASE NO.: |
|  | ) | JUDGE: |
| Plaintiffs, | ) ) | |
| vs. | ) ) ) | **CLASS ACTION COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND INJUNCTIVE RELIEF AGAINST CORPORATION AND DIRECTORS** |
| CLIFFS NATURAL RESOURCES INC., GARY B. HALVERSON, SUSAN M. CUNNINGHAM, BARRY J. ELDRIDGE, MARK E. GAUMOND, ANDRÉS R. GLUSKI, SUSAN M. GREEN, JANICE K. HENRY, JAMES F. KIRSCH, STEPHEN JOHNSON, RICHARD K. RIEDERER, TIMOTHY W. SULLIVAN, | ) ) ) ) ) ) ) ) ) ) ) | JURY TRIAL DEMANDED |
| Defendants. | ) ) | |

Plaintiff John Pope ("Plaintiff"), individually and on behalf of all others similarly situated shareholders of Cliffs Natural Resources Inc. ("CNR" or the "Company"), makes the following allegations against CNR and the other named defendants comprising CNR's Board of Directors (the "Board"). The allegations of this Complaint are based on personal knowledge of Plaintiff and on information and belief (including the investigation of counsel and review of publicly available information) as to all other matters.

## INTRODUCTION

1.      Plaintiff asserts this action to allow a fair vote between two rival slates of director candidates at CNR's next annual meeting on July 29, 2014.  CNR's current Board is attempting to prevent a fair vote by taking self-serving actions to entrench itself and fend off the competing slate.  The vote is important as CNR has been underperforming for years.  Casablanca Capital LP ("Casablanca"), an activist shareholder, has nominated six new director candidates for election to

the Board in response to its expressed concerns over CNR's poor performance and past mistakes. CNR's current Board, however, is using the terms of CNR's senior notes to warn of severe adverse consequences for CNR if Casablanca's slate of directors is elected at their expense.  The current CNR Board is doing this by refusing to take the simple step to "approve" Casablanca's nominated director candidates, a step that suggests no endorsement of the candidates and does not interfere with the current Board's ability to solicit votes for their re-election. "Approval" of Casablanca's proposed slate would prevent their election qualifying as a "change of control" under the terms of the senior notes and avoid triggering of certain "proxy puts." A "proxy put" results in CNR being forced to repurchase approximately $2.9 billion of its senior notes, more than eight times CNR's cash and equivalents as of March 31, 2014. CNR's shareholders are, therefore, faced with an unfair dilemma: either vote for the current Board, that has overseen poor performance and mistakes by the Company, or trigger financial armageddon for CNR by electing a new Board with ideas of improving the Company's performance.

2.      CNR's annual shareholder vote is scheduled for July 29, 2014.   All CNR shareholders as of June 2, 2014 will be entitled to vote.  Given that the record date has already been set and in light of the fact that the Annual Vote is less than 8 weeks away, immediate injunctive relief is essential in order to defuse the escalating shareholder crisis and prevent irreparable harm to Plaintiff.  By enjoining the vote and/or ordering the Board to "approve" Casablanca's nominated director candidates, CNR will sidestep the triggering conditions of the "proxy puts" and will avoid the crushing influx of debt associated with CNR's senior notes.  If the injunctive relief is not granted, Plaintiff and all other similarly situated shareholders will be effectively disenfranchised and forced to vote for the incumbent directors for fear of losing the entire worth of their investments once the "proxy puts" are triggered.

1

3.      Plaintiff respectfully requests expedited injunctive proceedings and that, among other things, the Court: (a) temporarily enjoin CNR's annual shareholder vote scheduled for July 29, 2014; (b) order the Board to "approve" Casablanca's nominated director candidates so as to avoid effecting a "change in control" if elected under the current circumstances; and (c) order payment by the defendants of any damages caused to CNR and/or Plaintiff as a result of the conduct complained of herein.

<u>JURISDICTION AND VENUE</u>

4.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332.

5.      Diversity exists, pursuant to 28 U.S.C. § 1332, because the plaintiff's citizenship is diverse from the citizenship of each of the named defendants.

6.      The matter in controversy exceeds the sum or value of $5,000,000 exclusive of interest and costs.

7.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.  Moreover, the defendants have received substantial compensation in this District by doing business here.  Venue is also proper because the actions complained of herein largely and substantively occurred in this District.

<u>PARTIES</u>

8.      Plaintiff John Pope has owned shares of CNR common stock from October 2013 through the present date, including while the events and transactions complained of herein transpired, and will continue to own CNR common stock throughout this litigation.  Plaintiff John Pope is a resident of Kansas.

9.      Defendant CNR is an Ohio corporation with its executive offices located at 200 Public Square, Suite 3300, Cleveland, Ohio 44114.  CNR common stock trades on the New York Stock Exchange under the ticker symbol "CLF".  The Company produces iron ore and metallurgical coal.  CNR operates iron ore and coal mines in North America and an iron ore mining complex in Western Australia.  Defendant CNR is a resident of Ohio.

10.      Defendant Gary B. Halverson ("Halverson") is CNR's President and Chief Executive Officer ("CEO").  Halverson joined CNR in November 2013 as President and Chief Operating Officer ("COO") and was elected as a director of the Company.  In February 2014, Halverson became CNR's CEO.  Prior to joining CNR, Halverson worked for Barrick Gold Corporation Inc. in various capacities, including its interim COO, President-North America, President-Australia Pacific, and Director of Operations-Australia Pacific.  Defendant Halverson is a resident of Ohio.

11.      Defendant Susan M. Cunningham ("Cunningham") has been a member of the Board since 2005.  Cunningham serves as a member of the Governance and Nominating Committee and the Strategy and Sustainability Committee.  Defendant Cunningham is a resident of Texas.

12.      Defendant Barry J. Eldridge ("Eldridge") has been a member of the Board since 2005.  Eldridge serves as a member of the Compensation and Organization Committee and the Chair of the Strategy and Sustainability Committee.  Defendant Eldridge resides in Perth, Australia.

13.      Defendant Mark E. Gaumond ("Gaumond") has been a director since 2013.  Gaumond serves as a member of the Audit Committee and Compensation and Organization Committee.  Defendant Gaumond is a resident of California.

3

14.     Defendant Andrés R. Gluski ("Gluski") has been a director since 2011.  Gluski serves as a member of the Audit Committee and Strategy and Sustainability Committee. Defendant Gluski is a resident of Washington, D.C.

15.     Defendant Susan M. Green ("Green") has been a director since 2007.  Green serves as a member of the Audit Committee and Governance and Nominating Committee. Defendant Green is a resident of Maryland.

16.     Defendant Janice K. Henry ("Henry") has been a director since 2009.  Henry serves as the Chair of the Audit Committee and a member of the Compensation and Organization Committee.  Defendant Henry is a resident of Florida.

17.     Defendant James F. Kirsch ("Kirsch") has been a director since 2010.  Kirsch serves as Chairman of the Board.  Defendant Kirsch is a resident of Michigan.

18.     Defendant Stephen Johnson ("Johnson") has been a director since 2013.  Johnson serves as a member of the Audit Committee and Governance and Nominating Committee. Defendant Johnson is a resident of Texas.

19.     Defendant Richard K. Riederer ("Riederer") has been a director since 2002. Riederer serves as the Chair of the Governance and Nominating Committee and a member of the Strategy and Sustainability Committee.  Defendant Riederer is a resident of Arizona.

20.     Defendant Timothy W. Sullivan ("Sullivan") has been a director since 2013. Sullivan serves as the Chair of the Compensation and Organization Committee and a member of the Strategy and Sustainability Committee.  Defendant Sullivan is a resident of Wisconsin.

21.     Defendants Halverson, Cunningham, Eldridge, Gaumond, Gluski, Green, Henry, Kirsch, Johnson, Riederer, and Sullivan (collectively, the "Director Defendants") comprise the

4

Board.  Each Director Defendant is sued herein individually in his/her capacity as a director and/or officer of CNR.

22.    The Director Defendants who are not CNR employees (*i.e.*, the Director Defendants except Halverson) receive an annual retainer fee, fees for meeting attendance, and an annual equity award.  The Lead Director and Committee Chairpersons receive additional retainer fees.  The following table, taken from CNR's Schedule 14A filed with the U.S. Securities & Exchange Commission (the "SEC") on May 23, 2014 (the "2014 Proxy Statement"), indicates director compensation for the Director Defendants (except Defendant Halverson who does not receive compensation for his role as a director per Company policy):

| Name | Fees Earned or Paid in Cash ($) | Stock Awards ($) | Change in Pension Value and Non-Qualified Deferred Compensation Earnings ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|
| Cunningham | 79,000 | 85,000 | — | 9,062 | 173,062 |
| Eldridge | 91,750 | 85,000 | — | 9,062 | 185,812 |
| Gaumond | 45,815 | 70,562 | — | 1,326 | 117,703 |
| Gluski | 78,500 | 85,000 | — | 4,491 | 167,991 |
| Green | 85,000 | 85,000 | — | 9,062 | 179,062 |
| Henry | 103,000 | 85,000 | — | 9,984 | 197,984 |
| Johnson | 23,500 | 50,767 | — | 366 | 74,633 |
| Kirsch | 333,750 | 835,000 | — | 24,850 | 1,172,189 |
| Riederer | 91,000 | 85,000 | — | — | 176,000 |
| Sullivan | 82,950 | 111,548 | — | 2,234 | 196,732 |

23.    By virtue of their positions as directors and/or officers of CNR, and/or their exercise of control and ownership over the business and corporate affairs of the Company, the Director Defendants have, and at all relevant times had, the power to control and influence and did control and influence and cause the Company to engage in the conduct complained of herein.

24.    Each Director Defendant owed and owes Plaintiff and all other similarly situated shareholders of CNR fiduciary obligations of candor, good faith, and loyalty and were and are required to: (a) use his/her ability to control and manage CNR in a fair, just, and equitable

5

manner; (b) act in furtherance of the best interests of CNR and its shareholders; (c) govern CNR in such a manner as to heed the expressed views of its public shareholders; (d) refrain from abusing his/her position of control; and (e) not favor his/her personal interest, or any third-persons' interests, at the expense of the Company and its public shareholders.

**FACTUAL BACKGROUND**

I.     CNR's Poor Economic Performance

25.     CNR's current distress can be traced back to 2011 when the Company spent $5 billion to acquire Consolidated Thompson Iron Mines Limited and its principal asset, a 75% interest in an iron ore mine located in Quebec, Canada, known as the Bloom Lake mine.  Bloom Lake consisted of one billion tons of resources, a concentrator to process ore, and transportation facilities.  CNR referred to the state of Bloom Lake at the time of the acquisition as "Phase 1" of three phases; "Phase 2" and "Phase 3" were aimed at increasing production at the mine through expansion and exploration.

26.     As would later be revealed, Bloom Lake was an incredibly poor acquisition. Serious operational problems arose at Bloom Lake, including the need for additional and/or modified equipment and shipping facilities so as to allow the Company to efficiently transport iron ore products, increased per-ton production costs for iron ore stemming from labor contracts and inefficient management, and decreased production volumes.  As a result, CNR was forced to suspend certain operational components of its "Phase 2" strategy and delay "Phase 3" outright.

27.     The issues at Bloom Lake dramatically impacted CNR's performance in terms of earnings and stock price.  In November 2012, one day after CNR announced substantive adjustments to its 2013 operating plan regarding Bloom Lake, Goldman Sachs downgraded CNR from "Neutral" to "Sell" and lowered its price target by approximately 33%.  Goldman Sachs

attributed the downgrade to concerns over expansion delays at Bloom Lake, increased production costs, and the Company's ability to continue paying its dividend.  In February 2013, several months later, CNR announced that it would be cutting its dividend by 76%.  The dramatic revision of the dividend came within just months of the Company's March 2012 decision to increase its dividend by 123% and repeated assurances from management that CNR would be able to maintain it.  The following month, in March 2013, Morgan Stanley and Credit Suisse downgraded their outlooks on CNR's stock, citing weak balance sheets, need to raise capital, structural changes business, and increased costs.

28.     Over the course of the past three years since CNR's acquisition of Bloom Lake, CNR's stock price has declined by over 80%, a drop in market capitalization of well-over $10 billion.  Despite being responsible for the initial acquisition of Bloom Lake and subsequent decline of the Company, CNR's executive management and Board have largely remained the same throughout it all; Defendants Cunningham, Eldridge, Green, Henry, Kirsch, Gluski, Sullivan, Gaumond, Halverson, and Johnson approved the Bloom Lake transaction and/or additional investments in Bloom Lake thereafter.

II.    The Board's Entrenchment Measures

29.     Defendants continue to comprise CNR's executive management team and/or Board—notwithstanding their extremely poor acquisitions and economic performance—in part due to certain entrenchment tactics.  Of particular significance is the "change of control" provisions within the indenture underlying CNR's senior notes that would require the Company to repurchase $2.9 billion worth of outstanding debt if triggered.

30. As of December 31, 2013, CNR had approximately $2.9 billion of its senior notes outstanding.[1] The indenture behind the Company's senior notes, which CNR issued in separate offerings over the course of the past several years, contained certain "change of control" provisions that would require CNR to repurchase the notes if triggered.[2] The indenture provided in pertinent part as follows:

**Change of Control Triggering Event**

Upon the occurrence of a Change of Control Triggering Event with respect to the notes . . . **each holder of notes will have the right to require us to purchase all or a portion of such holder's notes** pursuant to the offer described below (the "Change of Control Offer"), at a purchase price equal to 101% of the principal amount thereof plus accrued and unpaid interest, if any, to the date of purchase (the "Change of Control Payment"), subject to the rights of holders of notes on the relevant record date to receive interest due on the relevant interest payment date.

. . .

**On the Change of Control Payment Date, we will, to the extent lawful:**

- **accept or cause a third party to accept for payment all notes or portions of notes properly tendered pursuant to the Change of Control Offer;**

- **deposit or cause a third party to deposit with the paying agent an amount equal to the Change of Control Payment in respect of all notes or portions of notes properly tendered; and**

- deliver or cause to be delivered to the trustee the notes properly accepted together with an officers' certificate stating the aggregate principal amount of notes or portions of notes being repurchased and that all conditions precedent to the Change of Control Offer and to the repurchase by us of notes pursuant to the Change of Control Offer have been complied with.

. . .

For purposes of the foregoing discussion of a Change of Control Offer, the following definitions are applicable:

**"Change of Control" means the occurrence of any of the following after the date of issuance of the notes:**

1. the direct or indirect sale, lease, transfer, conveyance or other disposition (other than by way of merger or consolidation), in one or a series of related transactions, of all or substantially all of the assets of Cliffs and its subsidiaries taken as a whole to any "person" or "group" (as those terms are used in Section 13(d)(3) of the Exchange Act) other than to Cliffs or one of its subsidiaries;

---

[1] *See* CNR Form 10-K, February 14, 2014, p. 92.
[2] CNR's outstanding "senior notes" originate from four offerings: (i) $400 million in March 2010 (Form 424B5, March 11, 2010); (ii) $1 billion in September 2010 (Form 424B5, September 16, 2010); (iii) $1 billion in March 2011 (Form 424B5, March 17, 2011); and (iv) $500 million in December 2012 (Form 424B5, December 7, 2012).

2. the consummation of any transaction (including, without limitation, any merger or consolidation) the result of which is that any "person" or "group" (as those terms are used in Section 13(d)(3) of the Exchange Act, it being agreed that an employee of Cliffs or any of its subsidiaries for whom shares are held under an employee stock ownership, employee retirement, employee savings or similar plan and whose shares are voted in accordance with the instructions of such employee shall not be a member of a "group" (as that term is used in Section 13(d)(3) of the Exchange Act) solely because such employee's shares are held by a trustee under said plan) becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Exchange Act), directly or indirectly, of Voting Stock representing more than 50% of the voting power of our outstanding Voting Stock or of the Voting Stock of any of Cliffs' direct or indirect parent companies;

3. we consolidate with, or merge with or into, any Person, or any Person consolidates with, or merge with or into, us, in any such event pursuant to a transaction in which any of our outstanding Voting Stock or Voting Stock of such other Person is converted into or exchanged for cash, securities or other property, other than any such transaction where our Voting Stock outstanding immediately prior to such transaction constitutes, or is converted into or exchanged for, Voting Stock representing at least a majority of the voting power of the Voting Stock of the surviving Person immediately after giving effect to such transaction;

4. **the first day on which a majority of the members of our board of directors or the board of directors of any of Cliffs' direct or indirect parent companies are not Continuing Directors**; or

5. the adoption of a plan relating to our liquidation or dissolution.

. . .

"Change of Control Triggering Event" means, with respect to the notes, (i) the rating of such notes is lowered by each of the Rating Agencies on any date during the period (the "Trigger Period") commencing on the earlier of (a) the occurrence of a Change of Control and (b) the first public announcement by us of any Change of Control (or pending Change of Control), and ending 60 days following consummation of such Change of Control (which Trigger Period will be extended following consummation of a Change of Control for so long as any of the Rating Agencies has publicly announced that it is considering a possible ratings change), and (ii) such notes are rated below Investment Grade by each of the Rating Agencies on any day during the Trigger Period; provided that a Change of Control Trigger Event will not be deemed to have occurred in respect of a particular Change of Control if each Rating Agency making the reduction in rating does not publicly announce or confirm or inform the trustee at our request that the reduction was the result, in whole or in part, of any event or circumstance comprised of or arising as a result of, or in respect of, the Change of Control.

. . .

"Continuing Director" means, as of any date of determination, any member of the applicable board of directors who: (1) was a member of such board of directors on the date of issuance of the notes or (2) **was nominated for election, elected or appointed to such board of directors with the approval of a majority of the Continuing Directors who were members of such board of directors at the time of such nomination, election or appointment (either by a specific vote or by approval of a proxy statement in which such member was named as a nominee for election as a director**).

. . .

CNR, Form 424B5, March 11, 2005, pp. S-13 to S-15 (emphasis added).

31.     Additional entrenchment tactics exhibits by the Board include the questionable appointment of Defendant Halverson as CEO, as well as "change of control" provisions in executive employment agreements and attempts to amend Company bylaws without obtaining shareholder approval.  With regard to Defendant Halverson, the Board appears to have appointed him CEO in response to Casablanca's nomination of Lourenco Goncalves (discussed below) and for the purpose of avoiding a dispute over who should assume the executive position after months of vacancy. Defendant Halverson, however, has no experience leading a public company and appears to be reporting to Defendant Kirsch in his capacity as Executive Chairman.  Moreover, notwithstanding the fact that Defendant Halverson was previously engaged with a gold-mining company, he has no significant experience with ferrous metals (*e.g.*, iron) and required several months prior to his appointment as CEO to "build a deep understanding of the business at an operating level."

III.    Casablanca's Campaign Against CNR's Board

32.     The dispute between CNR's Board and Casablanca formally began on January 27, 2014.  In a letter to Kirsch, Casblanca expressed its dissatisfaction with the Company and urged the Board to take a number of actions aimed at improving the Company's overall operations and performance.[3]  In terms of the Company's past performance, Casablanca noted that CNR had "significantly underperformed both its peer group and the broader market," that CNR's stock had held the title of "biggest loser" in the S&P 500 for most of 2013, that CNR's stock price had declined more than 80% since its five-year high of $101.42 per share in mid-2011, and that the Company had spent approximately $8 billion on "ill-conceived acquisitions and development projects" over the past five years.  Casablanca demanded concluded its letter by proposing that

---

[3] *See* Casablanca's Form SC 13-D, January 28, 2014, Exhibit 1.

the Board: spin-off certain segments of CNR's business (specifically, its "Asia Pacific operations" and operations referred to as its "Bloom Lake project"); double the dividend; convert its domestic assets to a Master Limited Partnership; cut overhead and exploration costs; optimize cash costs and operating profitability; and divest infrastructure and non-core assets, among other things.

33.    CNR's Board responded to Casablanca's letter the same day by issuing a statement "welcome[ing] open communications" with its shareholders.[4]   The statement also asked that shareholders to forward any and all inquiries from the media to the Company's Investor Relations and/or Global Communications departments.

34.    On February 12, 2014, Casablanca issued a second letter to the Board.[5]  The letter notified the Company that Casablanca would be nominating a "majority slate" of candidate directors for election to the Board at the Company's 2014 annual meeting.

35.    CNR responded the same day by once again reiterating its appreciation for "open communications" with its shareholders.[6]   CNR also expressed its "disappoint[ment]" over Casablanca's apparent "intent on waging a public campaign rather than continuing its private engagement with [CNR's] Chairman and management . . . ."

36.    The dispute between CNR's Board and Casablanca escalated the following day on February 13, 2013, when the Board announced its decision to name Defendant Halverson as CEO.  Casablanca issued the following statement:

> The decision to name Gary Halverson CEO following months of leaving an empty chair comes just one day after we announced our support for Lourenco Goncalves to lead Cliffs. Mr. Halverson has never run a public company, and in our view does not have the relevant experience to fundamentally reshape and refocus the company. The board's action today only underscores its disregard for

---

[4] *See* CNR's Schedule 14A, January 28, 2014.
[5] *See* Casablanca's Schedule 13-D, February 12, 2014, Exhibit 4.
[6] *See* CNR's Schedule 14A, February 13, 2014.

shareholders and why we intend to reconstitute the board and bring in Mr. Goncalves, a proven value creator, to lead Cliffs.[7]

37.    On February 14, 2014, CNR and the Board issued an "open letter" to CNR's shareholders.[8]  The letter advised shareholders of the Board's purported efforts to work constructively with Casablanca, and detailed recent actions that had been taken in an attempt to remedy certain concerns identified by Casablanca.  The letter also affirmed the Board's confidence in CNR's executive management and, in particular, Defendant Halverson.

38.    Casablanca responded the same day, stating simply that the Company's actions had not gone far enough to accomplish the "fundamental changes" necessary to "restore value for shareholders."[9]  Casablanca also reaffirmed its preference for Lourenco Goncalves and advised that it would reveal its slate of director candidates at the appropriate time.

39.    On March 6, 2014, Casablanca launched a website, www.FixCliffs.com.  The website displayed a 32-page in-depth presentation analyzing CNR's past performance, the Board's past entrenchment tactics, and presenting its "strategic recommendations" for the proxy vote at the upcoming annual shareholder meeting, which was then scheduled for May 13, 2014.[10]

40.    Contemporaneously with the launching of its website, Casablanca sent CNR's Board a letter stating its intent to nominate six director candidates to the Board.[11]  The letter emphasized the Company's 80% decline in market value, lack of share ownership by corporate insiders (and thus an underlying lack of alignment between insider and shareholder interests), failed acquisition strategy, and poor expansion strategies.  Casablanca's letter also detailed certain "entrenchment tactics" attempted by the Board, including proposals to amend bylaws

---

[7] *See* Casablanca's Schedule 14A, February 14, 2014.
[8] *See* CNR's Schedule 14A, February 14, 2014.
[9] *See* Casablanca's Schedule 14A, February 14, 2014.
[10] *See* Casablanca's Schedule 14A, March 7, 2014, Exhibit 4.
[11] *See* Casablanca's Schedule 13-D/A, March 7, 2014, Exhibit 8.

without shareholder approval, proposals to eliminate cumulative voting, providing substantial payments to employees in the event of a change-in-control, and the "rushed and defensive" appointment of Defendant Halverson as CEO.

41.     On March 7, 2014, Casablanca filed its preliminary proxy materials with the SEC.[12]   The proxy materials proposed the election of Casablanca's slate of six director nominees: Robert P. Fisher, Jr., Celso Lourenco Goncalves, Patrice E. Merrin, Joseph Rutkowski, Gabriel Stoliar and Douglas Taylor, in opposition to the Company's director nominees.

42.     Casablanca's nominees are eminently qualified to serve as directors of CNR:

| Nominee | Key Qualifications |
|---|---|
| Celso Lourenco Goncalves | • Hired as CEO of Metals USA in February 2003; oversaw private takeover in November 2005 and subsequent initial public offering in April 2010; sold company to Reliance Steel & Aluminum in April 2013<br>• CEO of California Steel Industries from March 1998 to February 2003 |
| Rip Fisher | • Former Goldman Sachs Managing Director, Head of Mining and Head of Canadian Corporate Finance and Investment Banking<br>• Former Director of CML HealthCare Inc. |
| Patrice Merrin | • Director of Stillwater Mining<br>• Former Chairman of CML HealthCare Inc.<br>• Director of Climate Change and Emissions Management Corp.<br>• Former CEO of Luscar and Executive Vice President of Sherritt International |

---

[12] *See* Casablanca's Schedule 14A, March 7, 2014.

| | |
|---|---|
| Joseph Merrin | • Former Nucor Corporation Executive Vice President of Business Development |
| Gabriel Stoliar | • Managing Partner of Studio Investimentos, an asset management firm<br>• Former Vale S.A. CFO and Executive Director of Planning and Business Development<br>• Former BNDES Executive Director |
| Douglas Taylor | • CEO and Co-CIO of Casablanca Capital LP<br>• Former Lazard Frères & Co and Wasserstein Perella Managing Director<br>• Former Director and CFO of Sapphire Industrials |

43.    In response to Casablanca's preliminary proxy materials, CNR issued a press release announcing that, in an attempt to avoid a "costly and distracting proxy contest," the Board offered Casablanca the opportunity to appoint two directors and a third "mutually agreed upon" director at the upcoming annual meeting.[13]   The press release then indicated that Casablanca "rejected the Company's settlement offer and stated that [it] plan[s] to continue their effort to seek full control of the Cliffs' Board and to replace Cliffs' Chief Executive Officer through a proxy contest . . . ."  Finally, the press release indicated that the upcoming proxy vote and annual shareholder meeting would be postponed while CNR's Board continues to conduct negotiations with Casablanca.

44.    As would later be revealed by CNR in its 2014 Proxy Statement, CNR and Casablanca attempted to settle the escalating proxy context over the course of the next several weeks.[14]  On March 14, 2014, CNR met with Casablanca to discuss the possibility of reducing the size of the Board to nine directors and permitting Casablanca to appoint three directors.  On

---

[13] *See* CNR's Schedule 14A, March 7, 2014.
[14] *See* Casablanca's 2014 Proxy Statement, May 23, 2014.

March 20, 2014, Casablanca proposed a settlement agreement pursuant to which the Board would be reduced to nine directors, Casablanca would be permitted to appoint three of the nine directors, and Casablanca's Celso Lourenco Goncalves would serve as Chairman of the Board and Chair of the Strategic Committee.  In the following weeks, nine members of CNR's Board interviewed Mr. Goncalves and concluded that "it was not in the best interest of shareholders to appoint Mr. Goncalves as executive chairman of the the Cliffs Board or chairman of Cliffs' Strategy Committee."  Settlement discussions broke down once CNR notified Casablanca that the "executive or chairmanship roles" were unacceptable.

45.     On April 21, 2014, Casablanca sent an additional letter to CNR's Board demanding that it set a date for the annual shareholder meeting and proxy vote.[15]  Casablanca's letter also described its settlement efforts with CNR's Board as follows:

> Casablanca has spent over a month working within an agreed-upon framework to reach a settlement that would have provided a meaningful voice for shareholders and accelerated a desperately-needed process to restore value at Cliffs. Although we are bound to keep the details of our discussions private, we can state that Casablanca offered significant concessions as part of an agreement in principle. Despite our good-faith efforts, we have been thwarted by foot-dragging and evasion throughout the process. This has now culminated in the Board's refusal to consummate the agreement or offer any meaningful insight into what settlement terms might bridge our respective concerns. We are frustrated by the Board's apparent stall tactics, and believe that it has failed to show any genuine intention to conclude a mutually-acceptable settlement agreement in the best interests of shareholders.

46.     CNR's Board responded the same day, on April 21, 2014, once again "welcome[ing] open communications" with the Company's shareholders, reiterating its willingness to "engage with Casablanca to reach a resolution that is in the best interests of all

---

[15] *See* Casablanca's Schedule 13-D/A, April 21, 2014, Exhibit 11.

Cliffs shareholders."[16]    The Board's press release also stated that a new date for the annual shareholder meeting and proxy vote would be released in the near future.

47.    On April 25, 2014, CNR announced that its annual shareholder meeting would be held on July 29, 2014.[17]

48.    In response to CNR's setting of the annual shareholder meeting, Casablanca issued a press release expressing its "deep[] concern by the severe value destruction suffered by shareholders under the incumbent board" and noting that CNR scheduled the meeting "only after Casablanca had threatened a consent solicitation to force the Board to face its annual election . . . ."[18]

49.    On May 9, 2014, Casablanca released a 17-page presentation in support of its proposed slate of candidate directors, titled the "Case for Cliffs."[19]  The presentation reiterated the points expressed in Casablanca's March 6, 2014 presentation, including CNR's 80% decline in market value, dismal returns over the past five years, lack of capital-return to shareholders, failing acquisition strategy, entrenchment tactics, and the underwhelming amount of stock ownership by CNR insiders.

50.    On May 14, 2014, CNR released its own presentation, totaling 25 pages.[20]  The presentation articulated the Board's "new strategic direction," efforts towards rebuilding CNR's executive management and leadership, and recent lowered costs and improved results.  The presentation also reiterated the Board's disappointment over Casablanca's "intent on pursuing a costly and time consuming proxy contest."

---

[16] *See* CNR's Schedule 14A, April 22, 2014.
[17] *See* CNR's Form 8-K, April 25, 2014, Exhibit 99.1.
[18] *See* Casablanca Schedule 14A, April 25, 2014, Exhibit 1.
[19] *See* Casablanca Schedule 14A, May 9, 2014.
[20] *See* CNR Schedule 14A, May 14, 2014.

IV.     Board Threatens to Trigger the Proxy Puts

51.     CNR issued its 2014 Proxy Statement on May 23, 2014.[21]  The 2014 Proxy Statement "urged" CNR shareholders to vote in favor of all nine of CNR's director nominees; at the same time, the 2014 Proxy Statement alerted investors that CNR's Board was not endorsing Casablanca's director nominees.  The 2014 Proxy Statement stated, in pertinent part, as follows:

> **The Board of Directors does not endorse the election of any of Casablanca's nominees and strongly urges you to vote FOR ALL of the nine nominees recommended by the Board of Directors.** You may receive solicitation materials from Casablanca or certain entities or individuals affiliated with Casablanca, including a proxy statement and a _____ proxy card. We believe that Casablanca's director nominations are intended to pressure Cliffs to adopt Casablanca's previously proposed strategic plans, which the Board of Directors does not believe are in the best interests of Cliffs' shareholders. We believe that the nine nominees proposed by the Board of Directors are better equipped to serve Cliffs and all of its shareholders than the Casablanca nominees.

52.     CNR's Board went on to explain in the 2014 Proxy Statement the "possible effects" if Casablanca's director nominees were elected.  Significantly, the Board warned that if CNR's Board "experiences a 'change of control' and corresponding ratings downgrade," then CNR would have to (a) "offer to repurchase" the Company's "outstanding senior notes" and (b) payout "all future equity" awards "regardless of whether the employment of the award recipient is terminated."  "A 'change in control' generally occurs if a majority of members of the Cliffs Board of Directors is replaced by directors whose appointment or election is not endorsed by a majority of the Cliffs Board of Directors prior to the date of the appointment or election."

53.     The 2014 Proxy Statement's description of the Proxy Put is inaccurate and misleading.  Under the terms of CNR's senior notes a "change in control" does not occur when the CNR Board is replaced by directors whose appointment has not been "endorsed" by a majority of the CNR Board prior to their election. A change in control only occurs if the new

---

[21] *See* CNR Schedule 14A, May 23, 2014.

directors have not been "approved" by a majority of the pre-election Board.  Under the terms of the senior notes, the CNR Board can "approve" Casablanca's nominees without "endorsing" them.  "Approval" would avoid triggering the Proxy Puts while allowing the current CNR Board to continue its campaign to be re-elected over the Casablanca nominees.

54.    In a press release dated May 29, 2014, Casablanca emphasized the imminent danger to Plaintiff and other similarly situated shareholders as a result of the ongoing proxy contest between the increasingly unreasonable CNR Board and Casablanca: "In its proxy statement for the 2014 Annual Meeting of Shareholders — quietly filed late last Friday afternoon into a holiday weekend — Cliffs stated that the election of a majority slate of new directors proposed by Casablanca could trigger a change of control under the indenture governing Cliffs' senior notes, potentially compelling it to repurchase the notes. This mandatory repurchase — or 'Proxy Put' — would have a serious negative impact on Cliffs. We consider this an explicit threat to shareholders: vote for the incumbent Board or destroy the Company."[22]

55.    CNR's Board issued a press release the following day, May 30, 2014, in response to Casablanca's accusations.[23]  The press release identified Casablanca as the party responsible for placing CNR's shareholders in harm's way, and CNR's Board as the party ready, willing, and able to resolve the proxy contest and avoid jeopardizing the Company under the "proxy puts."

V.    CNR Cannot Afford to Repurchase $2.9 Billion of Senior Notes

56.    Regardless of whether CNR's Board or Casablanca is responsible, Plaintiff and other similarly situated shareholders will suffer the harm.  If CNR's annual shareholder vote proceeds under the current circumstances and Casablanca's slate is elected, then CNR must offer to repurchase all of its outstanding senior notes.  According to CNR's Form 10-Q filed with the

---

[22] *See* Casablanca Schedule 14A, May 29, 2014, Exhibit A.
[23] *See* CNR's Schedule 14A, May 30, 2014.

SEC on April 25, 2014, the carrying amount of its senior notes as of March 31, 2014, equaled approximately $2.9 billion.[24]  As of the same date, CNR's "cash and cash equivalents" equaled $364 million.[25]  Not only does CNR not have nearly enough cash to repurchase its senior notes, but it also cannot afford to pay the equity awards that would become due in the case of a "change in control."

57.    Given the risk to the Company and the real-life possibility that the value of Plaintiff's investment in CNR may be reduced to pennies after the "proxy puts" are triggered, Plaintiff and other similarly situated shareholders are left with no choice in terms of the upcoming annual shareholder vote: they must either support the incumbent directors or stand to lose everything.

58.    No valid business reason exists supporting the Board's actions.  Rather than "approve" Casablanca's director nominees solely for the purpose of sidestepping a "change in control" and avoiding the "proxy puts," CNR's Board is jeopardizing the fate of the Company in the name of brinksmanship.  Plaintiff and the other similarly situated shareholders stand to lose, unless injunctive relief is issued on an immediate basis.

## CLASS ALLEGATIONS

59.    Plaintiff brings this action pursuant to Rule 23(A) of the Ohio Rules of Civil Procedure, on behalf of all other holders of CNR common stock (except the defendants herein and any persons, firm, trust, corporation or other entity related to or affiliated with them and their successors in interest) who are or will be threatened with injury arising from the defendants' wrongful actions, as more fully described herein (the "Class").

60.    This action is properly maintainable as a class action.

---

[24] CNR Form 10-Q, April 25, 2014, p. 20.
[25] *Id*. at 4.

61.     The Class is so numerous that joinder of all members is impracticable.   The number of shares of common stock of CNR outstanding as of April 21, 2014 was 153,181,056. Plaintiff believes there are thousands of beneficial holders of CNR stock dispersed across the country and internationally.

62.     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual class member.   The common questions include, *inter alia*, the following:

    a.     Whether the Director Defendants have fulfilled, and are capable of fulfilling, their fiduciary duties to Plaintiff and the other members of the Class, including their duties of good faith, loyalty, due care, and candor;

    b.     Whether the Director Defendants breached their fiduciary duties by failing to "approve" Casablanca's director nominees for the purpose of sidestepping a "change in control" and avoiding the "proxy puts" despite the clear right to do so; and

    c.     Whether Plaintiff and the other members of the Class would be irreparably damaged by the conduct of the Director Defendants.

63.     Plaintiff anticipates that there will be no difficulty in the management of this litigation as a class action.

64.     The Director Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.   To the extent the Director Defendants continue their unlawful conduct complained of herein, preliminary and final injunctive relief on behalf of the Class as a whole will be entirely appropriate.

65. Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff has the same interests as the other members of the Class. Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

66. The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for defendants, or adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

## CLASS ACTION CLAIMS FOR RELIEF

## COUNT I

*Breach of Fiduciary Duty*

67. Plaintiff repeats and realleges the allegations set forth above as if fully set forth herein.

68. As directors of the Company, the Director Defendants owe CNR's stockholders the highest duties of care, loyalty, good faith and candor.

69. As set forth above, the Director Defendants refuse to "approve" Casablanca's director nominees for the purpose of sidestepping a "change in control" and avoiding the "proxy puts" for the primary purpose of obstructing the ability of Plaintiff and other similarly situated shareholders to remove the Director Defendants from office and preserve the significant benefits they receive as CNR directors and/or officers.

21

70.    CNR's and the Board's continued refusal to "approve" Casablanca's director nominees constitutes bad faith and disloyalty.

71.    Plaintiff is entitled to a declaration that the Director Defendants breached their fiduciary duties.

72.    Plaintiff has no adequate remedy at law.

## COUNT II

*Injunctive Relief to Enjoin Annual Shareholder Vote and/or*
*Force Board to Approve Director Candidates*

73.    Plaintiff repeats and realleges the allegations set forth above as if fully set forth herein.

74.    Absent an injunction enjoining CNR and Director Defendants from proceeding with the current proxy solicitation and/or requiring the Director Defendants to "approve" Casablanca's director nominees, Plaintiff and other similarly situated shareholders will be disenfranchised to the extent that they will be forced to vote for the Board's incumbent directors if they want to salvage the value of their CNR stock.

75.    There is no legitimate basis on which to refuse to neutralize the "proxy puts" and allow a non-coerced shareholder vote by "endorsing" Casablanca's director nominees.

76.    A substantial likelihood exists that Plaintiff will prevail on the merits of this claim.

77.    Plaintiff will suffer irreparable injury if the injunction is not granted.

78.    No third-parties exist that will be unjustifiably harmed if the injunction is granted.

79.    Public interest would be served by granting the injunction to the extent that it would discourage corporate actors from similar conduct in the future.

80.     Plaintiff is entitled to an injunction temporarily suspending CNR's annual shareholder vote scheduled for July 29, 2014, and/or requiring the Board to "approve" Casablanca's director nominees.

### RELIEF REQUESTED

**WHEREFORE**, Plaintiff demands judgment as follows:

(a)     Declaring this action properly maintainable as a class action;

(b)     Enjoining CNR and Director Defendants and/or their officers, agents, servants, affiliates, employees, attorneys and/or representatives and all those in privity or acting in concert with them from directly or indirectly proceeding with the Company's proxy solicitation and/or consents in connection with the upcoming July 29, 2014 CNR annual shareholder vote;

(c)     Declaring that the Director Defendants breached their fiduciary duties by refusing to "approve" Casablanca's director nominees;

(d)     Entering a mandatory injunction temporarily suspending the annual shareholder meeting and/or forcing the Director Defendants to "approve" Casablanca's director nominees;

(e)     Ordering the Director Defendants, jointly and severally, to account to Plaintiff, the other members of the Class, and the Company for all damages suffered and to be suffered by them as a result of the wrongs complained of herein, including pre- and post-judgment interest;

(f)     Awarding Plaintiff the costs and disbursements of this action including a

reasonable allowance for Plaintiff's attorney's fees and experts' fees and

pre- and post-judgment interest; and

(g)     Granting such other and further relief as this Court may deem to be just

and proper.

## **JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury.

Respectfully Submitted,

COHEN ROSENTHAL & KRAMER LLP

/s/ Joshua B. Fuchs_____
Joshua B. Fuchs (0087066)
jfuchs@crklaw.com
Joshua R. Cohen (0032368)
jcohen@crklaw.com
James B. Rosenthal (0062872)
jbr@crklaw.com
COHEN ROSENTHAL & KRAMER LLP
The Hoyt-Block Building—Suite 400
700 West St. Clair Avenue
Cleveland, Ohio  44113
(216) 781-7956 [Telephone]
(216) 781-8061 [Facsimile]

*Attorneys for Plaintiff John Pope*

*Of Counsel*:

LEVI & KORSINSKY, LLP
Nicholas I. Porritt, Esq.
Adam M. Apton, Esq.
1101 30th Street, N.W., Suite 115
Washington, D.C. 20007
T: (202) 524-4290
F: (202) 333-2121

## <u>VERIFICATION</u>

Under penalties as provided by law, the undersigned certifies that the statements contained in the foregoing complaint are true and correct, except as to matters therein stated to be on information and belief, and as to such matters, the undersigned certifies as aforesaid that he verily believes the same to be true.

Dated: June 6, 2014                               _/s/ John Pope_____
                                                                        John Pope